# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

CONCESSIONS HH, JV,

      Petitioner,

v.

THE UNITED STATES SMALL
BUSINESS ADMINISTRATION,

      Respondent.

Civil Action File No.
1:24-CV-1870-WMR

## PETITIONER CONCESSIONS HH, JV'S BRIEF IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Kian J. Hudson
*(Pro hac vice)*
Indiana Bar No. 32829-02
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 229-3111
Facsimile: (317) 231-7433
Email: kian.hudson@btlaw.com

Eric S. Fisher
Georgia Bar No. 250428
**BARNES & THORNBURG LLP**
3340 Peachtree Road N.E.,
Suite 2900
Atlanta, GA 30326-1092
Telephone: (404) 264-4045
Facsimile: (404) 264-4033
Email: EFisher@btlaw.com

*Counsel for Petitioner*

# Table of Contents

**Page**

INTRODUCTION ..................................................................................1

FACTUAL BACKGROUND ...................................................................4

I.    The COVID-19 Pandemic Crushes the Hospitality Industry..................4

II.   Congress Enacts the CARES Act and First-Draw PPP Loans................6

III.  Congress Enacts the Economic Aid Act and Second-Draw Loans ..........8

IV.  The SBA Issues the Unlawful Corporate Group Maximum Rule......... 10

V.   CHH Applies for and Receives Its PPP Loans ...................................... 12

VI.  The SBA Denies Forgiveness of CHH's Second-Draw Loan ................. 13

Standard of review.................................................................................. 14

ARGUMENT ........................................................................................ 15

I.    The SBA's Decision to Apply the Corporate Group Maximum Rule to CHH Contravened the Plain Statutory Text ........................................ 15

II.   Even If the SBA Could Apply the Corporate Group Maximum Rule to CHH, the Way It Did Here Was Arbitrary and Capricious................... 19

  A.   The SBA, arbitrarily and without explanation, counted an invalid loan when calculating the total amount borrowed by CHH's purported corporate group ...................................................................... 20

  B.   The SBA, arbitrarily and without explanation, denied forgiveness of all of CHH's second-draw loan, even the portion that fell under the Rule's $4 million cap ...................................................................... 22

CONCLUSION ..................................................................................... 25

i

# Table of Authorities

**Page**

**Cases**

*Bidi Vapor LLC v. U.S. Food & Drug Admin.*,
  47 F.4th 1191 (11th Cir. 2022) ....................................... 15, 19, 22

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) .................................................. 19

*Gupta v. McGahey*,
  737 F.3d 694 (11th Cir. 2013) ....................................... 16

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ............................................... 15

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024) ......................................... 19, 22, 25

*Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*,
  788 F.2d 705 (11th Cir. 1986) .................................... 19, 20

*United States v. Fuentes-Rivera*,
  323 F.3d 869 (11th Cir. 2003) ....................................... 17

**Statutes**

5 U.S.C. § 706(2)(A) ....................................... 14, 15, 19, 22

15 U.S.C. § 636(a)(36) ..................................................6

15 U.S.C. § 636(a)(36)(D)(i) ............................................6

15 U.S.C. § 636(a)(36)(D)(iii) ..........................................7

15 U.S.C. § 636(a)(36) (D)(iv) ................................... 1, 7, 16

15 U.S.C. § 636(a)(36)(E) ..............................................9

15 U.S.C. § 636(a)(37) ..................................................8

15 U.S.C. § 636(a)(37)(A)(iv) ..........................................9

ii

15 U.S.C. § 636(a)(37)(B) .................................................................8

15 U.S.C. § 636(a)(37)(C) .................................................................9

15 U.S.C. § 636(a)(37)(E) ..................................................... 2, 9, 16

15 U.S.C. § 636(a)(37)(J)(ii) ................................................ 9, 23, 24

15 U.S.C. § 636(B) ............................................................................7

15 U.S.C. § 636(D) ...........................................................................6

15 U.S.C. § 636m(b) .................................................................. 8, 23

Pub. L. 116–136, 134 Stat 281 .........................................................6

Pub. L. 116-260 ................................................................................8

## Other Authorities

13 C.F.R. § 121.103 ..................................................................*passim*

13 C.F.R. § 121.103(a) ................................................................ 7, 16

13 C.F.R. § 121.103(c) .................................................................... 17

13 C.F.R. § 121.103(e) .................................................................... 17

85 Fed. Reg. 20817 (April 15, 2020) ............................................... 10

85 Fed. Reg. 26324 (May 4, 2020) ...................................... 3, 10, 11

86 Fed. Reg. 3692 (Jan. 14, 2021) ...........................................*passim*

86 Fed. Reg. 3712 (Jan. 14, 2021) ........................................... 11, 12

Ignacio Felix, Adrian Martin, Vivek Mehta, and Curt Mueller, *US
    food supply chain: Disruptions and implications from COVID-19* ...............5

Labor Statistics, *Employment Numbers in Accommodation and
    Food Services Industry 2014-2024*, available at
    https://perma.cc/A74H-PWC8 .......................................................5

McKinsey & Company (July 2, 2020), https://perma.cc/R8SP-L44V .................5

iii

## INTRODUCTION

Petitioner Concessions HH, JV (CHH) operates a concessions business at the Atlanta International Airport. CHH's business necessarily depends on customers being able and willing to eat together in public, outside their homes. For this reason, CHH, like many similar hospitality businesses, was devastated by the COVID-19 pandemic. Without a lifeline, it would have needed to choose between closing its doors or laying off its employees.

Fortunately, that lifeline came in the form of the Paycheck Protection Program (PPP). As its name suggests, the PPP provided funds to businesses to allow them to keep their employees on payroll. To do so, the PPP directed the Small Business Administration (SBA) to issue government-guaranteed loans to small businesses. And Congress made these loans fully forgivable so long as the loan recipient used the funds for statutorily specified purposes, such as keeping employees on its payroll—which CHH undisputedly did.

Further, in light of the distinctive burdens the pandemic imposed on businesses in the hospitality industry, Congress included special provisions easing requirements for these businesses. One such provision, critically important here, waived SBA regulations "**applicable to affiliations …, or any successor regulation**." 15 U.S.C. § 636(a)(36)(D)(iv) (emphasis added). In other words, Congress prohibited the SBA from considering hospitality

1

businesses' affiliates when determining their eligibility for PPP loans. For example, while the SBA ordinarily counts a business's employees **and** the employees employed by its affiliates when determining whether a business satisfies the PPP "size" rules, this waiver provision means the SBA **cannot** consider affiliates when evaluating hospitality businesses.

Congress authorized the first set of PPP loans in March 2020 via the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act). Later that year, Congress enacted the Economic Aid Act, which authorized a second set of PPP loans. These second-draw loans were subject to the same general statutory framework as the first-draw loans, though with slightly tightened conditions. Once again, Congress barred the SBA from considering hospitality businesses' affiliates, providing that the CARES Act's waiver of affiliation rules also applies to second-draw PPP loans. 15 U.S.C. § 636(a)(37)(E).

Below, the SBA's "Affiliate Narrative" found that CHH has 97 affiliates because it is part of "a 'family' of 98 entities defined by common ownership and/or common management" (which this brief refers to as the "Russell Group"). SMF ¶ 3[1]. But because there is no dispute that CHH is in the hospitality industry and subject to the statutory waiver of affiliation rules, the

---

[1] The citations designated "SMF" in this brief refer to the paragraph numbers in CHH's Statement of Undisputed Material Facts, which in turn includes substantiating citations to the Administrative Record.

SBA did not consider CHH's affiliates when counting up CHH's employees. *Id.* ¶¶ 23, 27. There is thus no dispute that CHH satisfied the PPP's size rules (i.e., employed fewer employees than the statutory cap). *Id.* ¶ 27. There is also no dispute that CHH used the PPP funds for proper purposes, including keeping workers employed. *Id.* ¶¶ 13, 24.

Nevertheless, although CHH did precisely what Congress required, the SBA denied forgiveness of CHH's second-draw PPP loan. It did so solely based on its "Corporate Group Maximum" Rule—an SBA-invented rule that imposed caps ($4 million for second-draw loans) on the total amount of loans received by businesses "majority owned, directly or indirectly, by a common parent." 85 Fed. Reg. 26324, 26325 (May 4, 2020). Applying this Rule, the SBA concluded CHH "was ineligible for the PPP loan" because it "is part of a corporate group has received more than $4,000,000 of 2nd draw PPP loans in the aggregate." SMF ¶¶ 18, 21. In particular, it found that the businesses in the Russell Group had collectively received about $3.4 million in second-draw loans when CHH received its $2 million loan; because CHH's $2 million loan put the total above $4 million, the SBA denied forgiveness of CHH's entire loan. *Id.* ¶¶ 22, 25.

This conclusion is wrong. The Corporate Group Maximum Rule is plainly an affiliation rule that the SBA cannot apply to hospitality businesses. The SBA's application of the Rule here is thus contrary to law.

Further, even on its own terms, the SBA applied the Rule arbitrarily. The $3.4 million received by CHH's affiliates includes a $2 million loan the SBA itself says is invalid; it was unjustified and arbitrary for the SBA to nevertheless include that loan in the total (which, without that loan, would fall below the cap even including CHH's loan). And regardless, it was arbitrary to deny forgiveness of CHH's entire loan when—even on the SBA's view—the corporate group had nearly $600,000 left before hitting the cap.

For these reasons, the Court should hold that the SBA's decision relied on an unlawful regulation and that the SBA arbitrarily applied that regulation to CHH. The Court should therefore reverse and set aside the SBA's decision, direct the agency to forgive CHH's second-draw loan, and vacate the Corporate Group Maximum Rule as applied to hospitality businesses.

## FACTUAL BACKGROUND

### I. The COVID-19 Pandemic Crushes the Hospitality Industry

Prior to the onset of the COVID-19 pandemic in March 2020, consumer spending on food in the United States was remarkably stable. The previous five years had seen spending grow at an annual rate of 4%, split evenly between retail outlets (such as grocery stores) and food-service companies (such as restaurants, fast-food locations, coffee venues, and casual-dining

locations).[2] And in February 2020 the hospitality industry—i.e., businesses classified with North American Industry Classification System (NAICS) Code 72—employed almost 14.4 million people.[3]

In March 2020, however, everything changed. The public-health measures governments imposed in response to the pandemic—such as physical-distancing practices and associated lockdowns—"dramatically reversed the trend of consumer spending on food."[4] In particular, "[c]onsumers, forgoing public venues and eating at home, stocked up on groceries and supplies, boosting sales for the month by 29 percent over the prior year. Meanwhile, sales declined at restaurants, fast-food locations, coffee venues, and casual-dining locations by 27 percent."[5] Accordingly, businesses in the hospitality industry were faced with the grim choice between laying off their

---

[2] Ignacio Felix, Adrian Martin, Vivek Mehta, and Curt Mueller, *US food supply chain: Disruptions and implications from COVID-19*, McKinsey & Company (July 2, 2020), https://perma.cc/R8SP-L44V.

[3] U.S. Bureau of Labor Statistics, *Employment Numbers in Accommodation and Food Services Industry 2014-2024*, available at https://perma.cc/A74H-PWC8. U.S. Census Bureau, *NAICS Sector—72 Accommodation and Food Services*, available at https://perma.cc/FU8K-622C, (explaining that NAICS72, the "Accommodation and Food Services sector[,] comprises establishments providing customers with lodging and/or preparing meals, snacks, and beverages for immediate consumption."). For ease of reference, this brief refers to this industry as the "hospitality" industry.

[4] Felix, *supra* note 1.

[5] Felix, *supra* note 1.

workers or closing their doors altogether. Indeed, in April 2020, shortly after the pandemic fully infiltrated the United States, the employment numbers for the hospitality industry were nearly halved, totaling just over 7.5 million.[6]

## II.   Congress Enacts the CARES Act and First-Draw PPP Loans

Congress, however, soon adopted measures to avert the unfolding economic catastrophe. On March 27, 2020, the President signed the CARES Act into law, providing emergency assistance for businesses affected by the pandemic. Pub. L. 116–136, 134 Stat 281. A major element of this emergency assistance was the PPP. The CARES Act created the PPP by amending Section 7(a) of the Small Business Act, 15 U.S.C. 636(a), to authorize the SBA to issue a large volume of forgivable loans to eligible businesses. 15 U.S.C. § 636(a)(36).

As the SBA has noted, one of the PPP's primary purposes was to allow small businesses to retain employees and to protect the paychecks of millions of Americans employed by those businesses. 86 Fed. Reg. 3692, 3698 n.34 (Jan. 14, 2021). To effectuate this purpose, the PPP employed more expansive eligibility criteria than other types of Section 7(a) program loans. 15 U.S.C. § 636(D). For example, so long as a business employed fewer than 500 employees, it was eligible to receive a PPP loan. 15 U.S.C. § 636(a)(36)(D)(i). This size requirement, which generally required aggregating the employees

---

[6] U.S. Bureau of Labor Statistics, *supra*, note 2.

employed by the specific business seeking the loan **and** any affiliated (e.g., commonly owned) businesses, accomplished dual purposes. It both allowed for a greater number of businesses to access PPP loans (in comparison to other Section 7(a) loans) and made sure that the PPP loans went to the small businesses that Congress sought to help with the CARES Act. Subject to these sorts of statutorily specified exceptions, Congress stated that the PPP loans would be guaranteed under the "same terms, conditions, and processes" as typical Section 7(a) loans. 15 U.S.C. § 636(B).

Similarly, recognizing the pandemic's devastating impact on businesses in the hospitality industry specifically, Congress also explicitly expanded eligibility for such businesses—that is, businesses that employed fewer than 500 employees per physical location and were assigned a "North American Industry Classification System code beginning with 72." 15 U.S.C. § 636(a)(36)(D)(iii). Importantly, for such businesses, the CARES Act provided that "**the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived with respect to eligibility for a covered loan.**" 15 U.S.C. § 636(a)(36)(D)(iv) (emphasis added); *see also* 13 C.F.R. § 121.103(a) (providing that businesses are affiliates of one another if a third party exercises ownership or managerial control over both businesses).

7

In addition to setting out the criteria that determined which businesses would be eligible for federally guaranteed loans, the CARES Act guaranteed businesses that their loans would be forgiven if they used the loaned funds for the statutorily prescribed purposes: "An eligible recipient **shall** be eligible for forgiveness of indebtedness on a covered loan in an amount equal to the sum of the . . . costs incurred and payments made during the covered period" for expenses and payments on items such as payroll costs and rent. 15 U.S.C. § 636m(b) (emphasis added). This guarantee, of course, was necessary to effectuate the purpose of the PPP—inducing employers to keep employees on payrolls even though the pandemic may have prevented employees from working for them or prevented customers from patronizing their business.

## III.  Congress Enacts the Economic Aid Act and Second-Draw Loans

Nine months later, in December 2020, Congress enacted the Economic Aid Act. *See* Pub. L. 116-260. Following the same structure of the first-draw PPP loans, the Economic Aid Act amended Section 7(a) of the Small Business Act to authorize a second set of PPP loans. 15 U.S.C. § 636(a)(37).

Congress provided that the eligibility for these second-draw PPP loans should generally be assessed under the same terms as the first-draw loans, subject to a handful of slightly tightened conditions. 15 U.S.C. § 636(a)(37)(B). For example, the Economic Aid Act provided that, for businesses with a NAICS

Code 72 designation, a second-draw loan was capped at $2 million (compared to $10 million for first-draw loans). 15 U.S.C. § 636(a)(37)(C), (a)(36)(E). Similarly, the Economic Aid Act reduced the employee-count maximum from 500 to 300 employees. 15 U.S.C. § 636(a)(37)(A)(iv). Despite these tightened restrictions, the Economic Aid Act reiterated the CARES Act's waiver of affiliation rules for businesses in the hospitality industry. 15 U.S.C. § 636(a)(37)(E) ("The waiver described in paragraph (36)(D)(iv) shall apply for purposes of determining eligibility under this paragraph"). That is, Congress provided that the CARES Act's waiver of affiliation provisions under 13 C.F.R. § 121.103, or any successor regulation, also applied with respect to hospitality businesses' eligibility for second-draw PPP loans.

Furthermore, like first-draw PPP loans, Congress declared that recipients of second-draw PPP loans would be entitled to loan forgiveness so long as they used the funds for proper purposes, including payroll costs. 15 U.S.C. § 636(a)(37)(J)(ii) (providing generally that "an eligible entity **shall** be eligible for forgiveness of indebtedness on a covered loan in the same manner as an eligible recipient with respect to a loan made under paragraph (36) of this section, as described in section 636m of this title" (emphasis added)).

## IV.    The SBA Issues the Unlawful Corporate Group Maximum Rule

Following the CARES Act's enactment, the SBA promulgated its initial rule implementing the PPP on April 2, 2020, and two weeks later it followed up with a more detailed interim rule addressing how the SBA's affiliation rules apply to the PPP. 85 Fed. Reg. 20817, 20818 (April 15, 2020). This interim rule specifically recognized the significance of the CARES Act's waiver of affiliation rules: It noted that, while most borrowers would be considered with their affiliates for purposes of determining eligibility for the PPP, the CARES Act's waiver of affiliation rules for hospitality businesses "remain[ed] in full force and effect." *Id.* at 20818 n.1. "As a result," the SBA noted, "the affiliation rules contained in section 121.301" and section 121.103 "**do not apply to these types of entities**." *Id.* (emphasis added).

Weeks later, however, the SBA disregarded the statutory waiver of affiliation rules in adopting its Corporate Group Maximum Rule. 85 Fed. Reg. 26324. The Rule (which was never codified in the Code of Federal Regulations) provided that businesses that are part of a single "corporate group" could not receive more than $20 million in PPP loans. *Id.* at 26325. The Rule defined "corporate group" to mean that businesses are "part of a single corporate group **if they are majority owned, directly or indirectly, by a common parent**." *Id.* (emphasis added). Remarkably, and without explanation or

justification, the SBA insisted that this rule's treatment of corporate affiliates applied to **all** businesses, even those in the hospitality industry: "Businesses are subject to [the Corporate Group Maximum Rule] **even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act**." *Id.* (emphasis added).

On January 14, 2021, following passage of the Economic Aid Act, the SBA promulgated another regulation that incorporated the Economic Aid Act and consolidated in one place the myriad "interim final rules (and important guidance)" that the agency had issued over the prior nine months. 86 Fed. Reg. 3692, 3692. In this new rule, the SBA doubled down on its defiance of the statutory waiver of affiliation rules—again without offering any explanation. *See id.* at 3702 (restating Corporate Group Maximum Rule and reiterating that "[b]usinesses are subject to this limitation even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act").

That same day, the SBA also promulgated a rule targeted at second-draw PPP loans. 86 Fed. Reg. 3712 (Jan. 14, 2021). This regulation once again acknowledged that "[e]ligibility for Second Draw PPP Loans is governed by the same affiliations rules (and waivers) as First Draw PPP Loans" and that "[t]he affiliation rules under 13 C.F.R. § 121.301(f) are waived with respect to eligibility for a Second Draw PPP Loan" for hospitality businesses with 300 or

fewer employees. *Id.* at 3718. Yet the regulation also reiterated the Corporate Group Maximum Rule, keeping the original Rule's definition of "corporate group" and providing that "[b]usinesses that are part of a single corporate group shall in no event receive more than $4,000,000 of Second Draw PPP Loans in the aggregate." *Id.* at 3720 (adopting 86 Fed. Reg. at 3702).

## V.    CHH Applies for and Receives Its PPP Loans

CHH is part of the hospitality industry and has a NAICS code beginning with 72 (722513). SMF ¶¶ 1–2. The SBA found below that CHH is one of a group of 98 entities (known as the Russell Group) tied together by common ownership or management. *Id.* ¶ 3. The businesses constituting the Russell Group collectively employ over 1,100 individuals. *Id.* ¶ 4. Early in the pandemic, CHH (along with other businesses in the Russell Group) applied for and received a first-draw PPP loan. *Id.* ¶¶ 5,6. The SBA approved forgiveness of CHH's first-draw loan. *Id.* ¶ 7. Because the aggregate loan total borrowed by the businesses in the Russell Group was below the Corporate Group Maximum Rule's $20 million cap, the SBA did not find that CHH's first-draw loan violated the Rule. *Id.* ¶ 6.

On May 29, 2021, CHH was approved for a $2 million second-draw PPP loan. *Id.* ¶ 11. CHH's loan was disbursed on June 1, 2021. *Id.* ¶ 12. In the preceding few months, eight other businesses in the Russell Group had earlier

applied for and received second-draw PPP loans. *Id.* ¶ 8. One of these businesses, H.J. Russell & Company, received a loan for $2 million. *Id.* The cumulative amount of these eight earlier second-draw PPP loans was $3,409,573.82. *Id.* ¶ 9. Notably, after disbursing the second-draw loan to H.J. Russell—and before H.J. Russell applied for forgiveness—the SBA concluded that H.J. Russell was ineligible for its $2 million second-draw PPP loan. *Id.* ¶ 10. The cumulative amount of second-draw loans borrowed by CHH and its affiliates in the Russell Group was $5,409,573.82. *Id.* ¶ 14.

## VI.    The SBA Denies Forgiveness of CHH's Second-Draw Loan

CHH applied for forgiveness of its second-draw PPP loan on July 19, 2022. *Id.* ¶ 16. CHH's lender recommended forgiveness of CHH's entire $2 million loan. *Id.* ¶ 17. On November 21, 2022, however, the SBA denied CHH's loan-forgiveness application, determining that CHH "was ineligible for the PPP loan." *Id.* ¶ 18. The Corporate Group Maximum Rule was the SBA's sole rationale. *Id.* ¶ 24. The SBA stated that CHH was "part of a corporate group [that had] received more than $4,000,000 of 2nd draw PPP loans in the aggregate," *id.* ¶ 21, explaining that CHH and other businesses in the Russell Group had "common ownership" and "common management . . . among Donata Russell Major and/or H. Jerome Russell, Jr., and/or Michael Brent Russell," *id.* ¶ 19. The SBA concluded that, when CHH's second-draw loan was disbursed,

CHH "exceeded the Corporate Group Max of $4MM, for Second Draw loans." *Id.* ¶ 22. And the SBA denied forgiveness "even though [CHH had] a NAICS 72 waiver of the affiliation rules." *Id.* ¶ 23.

In reaching this conclusion, the SBA counted H.J. Russell's invalid $2 million loan. *Id.* ¶¶ 10, 14. The agency also denied forgiveness of CHH's entire $2 million loan even though (counting the H.J. Russell loan) the purported "corporate group" had about $600,000 left before hitting the Corporate Group Maximum Rule's $4 million cap. *Id.* ¶ 9.

On December 21, 2022, CHH timely appealed SBA's Final Loan Review Decision to SBA's Office of Hearings and Appeals ("OHA"). *Id.* ¶ 26. On March 20, 2023, OHA issued its decision affirming SBA's Final Loan Review Decision. *Id.* ¶ 31. OHA affirmed the denial of forgiveness of CHH's entire $2 million loan, again relying solely on the Corporate Group Maximum Rule: It concluded that CHH "and all the other businesses it is **affiliated with** exceed the Corporate Group Maximum" because CHH "**and its affiliates** withdrew $5,409,573.82 in second draw PPP loans." *Id.* ¶¶ 28–30. On April 29. 2024, CHH timely filed its petition for judicial review with this Court. *Id.* ¶ 32.

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), a "reviewing court shall ... hold unlawful and set aside agency action" that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When the lawfulness of an agency action turns on the meaning of a statutory provision, the reviewing court applies a de novo standard of review and does not defer to the agency's interpretation. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("[C]ourts decide legal questions by applying their own judgment."). And when determining if an agency's decision is arbitrary and capricious, the court requires that the "agency action be reasonable and reasonably explained," and rest on "consideration of the relevant factors." *Bidi Vapor LLC v. U.S. Food & Drug Admin.*, 47 F.4th 1191, 1202 (11th Cir. 2022) (quotation marks and citations omitted). Further, courts "consider only the basis articulated by the agency itself, not appellate counsel's *post hoc* rationalizations." *Id.* (quotation marks and citations omitted).

## ARGUMENT

### I.  The SBA's Decision to Apply the Corporate Group Maximum Rule to CHH Contravened the Plain Statutory Text

Congress recognized the special burdens the COVID-19 pandemic placed on hospitality businesses, and it was crystal-clear that the SBA must implement the PPP without regard to those businesses' affiliates: So long as a business had a NAICS Code beginning with 72 and employed fewer than 300 employees per physical location, the CARES Act provides that the SBA's regulations "**applicable to affiliations** under section 121.103 of title 13, Code

of Federal Regulations, **or any successor regulation**, **are waived** with respect to eligibility for a covered loan for" that business. 15 U.S.C. § 636(a)(36)(D)(iv). Congress's decision to include the word "any" indicates its intention that this waiver apply broadly, to cover each and every new regulation that resembles the affiliation analysis in 13 C.F.R. § 121.103. *See, e.g., Gupta v. McGahey*, 737 F.3d 694, 696 (11th Cir. 2013) (Wilson, J., concurring) (explaining the "broad scope of the word 'any'"). And Congress expressly reiterated this waiver of affiliation rules when it created second-draw PPP loans via the Economic Aid Act. 15 U.S.C. § 636(a)(37)(E). The SBA's application of its Corporate Group Maximum Rule to CHH's second-draw loan contravenes this unambiguous statutory command.

The Corporate Group Maximum Rule is plainly a "successor regulation" to the affiliation rules in 13 C.F.R. § 121.103. After all, the Rule is obviously about affiliates: It makes a business's eligibility for a PPP loan depend on the extent to which its affiliates obtained PPP loans.

In fact, the Rule's definition of "corporate group" **directly parallels** the affiliation rules in 13 C.F.R. § 121.103: When the CARES Act was enacted, that regulation provided that entities will be deemed affiliates of each other—that is, will be aggregated together—when … **a third party or parties controls or has the power to control both**." 13 C.F.R. § 121.103(a)(1). And that

16

regulation further provided that affiliation exists where there is **common ownership** or **common management**. 13 C.F.R. § 121.103(c), (e) (version effective Dec. 30, 2019 to Apr. 14, 2020).[7] The Corporate Group Maximum Rule likewise aggregates businesses together when they are "**majority owned, directly or indirectly, by a common parent**." 86 Fed. Reg. at 3702 (emphasis added). In essence, the Rule calls for the same affiliate analysis as 13 C.F.R. § 121.103. It is thus a "successor regulation" to 13 C.F.R. § 121.103.

Indeed, any reading to the contrary would allow the SBA to evade the waiver of affiliation rules by imposing the statutorily disclaimed affiliate analysis under a different name. This would render the provision—including its "successor regulation" language—a nullity. *See, e.g., United States v. Fuentes-Rivera*, 323 F.3d 869, 872 (11th Cir. 2003) ("[W]hen interpreting a statute, it is necessary to give meaning to all its words so that no words shall be discarded as being meaningless, redundant, or mere surplusage." (quotation marks and citation omitted)).

The SBA's conduct in this very case aptly illustrates this point. **The SBA directly cited 13 C.F.R. § 121.103** when it conducted its "common owner" affiliation analysis to conclude that CHH was ineligible for its second-draw

---

[7] This is the version of the regulation that existed when the CARES Act was enacted. For the Court's convenience, this version is included as an Addendum to this brief.

PPP loan. *Id.* ¶ 17 ("Per 13 C.F.R. § 121.103 . . . ."). Employing the language of 13 C.F.R. § 121.103, the SBA determined that the Russell Group constitutes a single "corporate group" due to "**common ownership**" and "**common management** . . . among Donata Russell Major and/or H. Jerome Russell, Jr., and/or Michael Brent Russell." SMF ¶ 19 (emphasis added). And the "Affiliate Narrative" that underlies the SBA's determination in this case consists of a **single** affiliate analysis that identified 98 entities that **both** constituted the Russell Family "corporate group" for the purposes of the Corporate Group Maximum Rule **and** constituted affiliates under 13 C.F.R. § 121.103 for the purposes of the PPP's employee-count cap (which the SBA applied to conclude that H.J. Russell was ineligible for its second-draw PPP loan). *Id.* ¶ 10.

Because the Corporate Group Maximum Rule is a "successor regulation" to the SBA's earlier affiliation rules, the CARES Act prohibits the SBA from applying the Rule to determine any hospitality business's "eligibility" for a PPP loan. Yet that is precisely what the SBA did here. The SBA denied CHH's loan-forgiveness application solely on the basis that the CHH violated the Corporate Group Maximum Rule, *id.* ¶ 24, and therefore "was **ineligible** for the PPP loan." *Id.* ¶ 18 (emphasis added). The SBA's conclusion—that violation of the Corporate Group Maximum Rule foreclosed CHH's eligibility for a second-draw PPP loan—was repeated throughout its loan-review analysis. *Id.* Accordingly,

the SBA's application of the Corporate Group Maximum Rule here contradicts the CARES Act. The decision should thus be vacated and the case remanded to the agency with instructions to forgive CHH's loan.

## II. Even If the SBA Could Apply the Corporate Group Maximum Rule to CHH, the Way It Did Here Was Arbitrary and Capricious

The APA bars agencies from acting in an arbitrary and capricious manner. 5 U.S.C. § 706(2)(A). That means agencies must offer reasoned explanations of their actions, which ensures their reasons can be "scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Reviewing courts thus must "ensure, among other things, that the agency has offered "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (quotation marks and citation omitted).

The arbitrary-and-capricious standard also requires reviewing courts to ensure the "agency considered all the relevant factors and important aspects of the problem." *Bidi Vapor*, 47 F.4th at 1202 (quotation marks, citations, and brackets omitted). To determine if an agency has done so, a court may look to the language of the relevant statutes, regulations, the administrative record, and even facts beyond the administrative record. *See id*. And though reviewing courts will not substitute their judgment for the agency, the arbitrary-and-

19

capricious standard is not a "rubber stamp." *Port of Jacksonville Mar. Ad Hoc Comm., Inc. v. U.S. Coast Guard*, 788 F.2d 705, 708 (11th Cir. 1986).

Here, even assuming that the SBA's could apply the Corporate Group Maximum Rule to CHH, the specific manner with which the agency applied that Rule was neither reasonable nor reasonably explained: Without any purported justification, the SBA (1) included an **invalid** loan when calculating the "corporate group's" aggregate loan amount, and (2) denied forgiveness of CHH's **entire** loan even though the "corporate group" was nearly $600,000 below the cap even on the SBA's own reckoning. Accordingly, the SBA's decision denying CHH's loan forgiveness application was arbitrary and capricious for two independently and sufficient reasons.

## A.    The SBA, arbitrarily and without explanation, counted an invalid loan when calculating the total amount borrowed by CHH's purported corporate group

As explained above, the SBA denied forgiveness of CHH's $2 million second-draw loan because, at the time CHH received this loan, eight other businesses in the Russell Group had received a cumulative total of $3,409,573.82 in second-draw PPP loans. SMF ¶¶ 8, 9. This $3,409,573.82, however, includes a $2 million loan the SBA issued to H.J. Russell that the SBA **later concluded was invalid** (on the ground that H.J. Russell is not a hospitality company, that it is therefore ineligible for the waiver of affiliation

rules, and that when aggregated with its affiliates exceeds the PPP's number-of-employees cap). *Id.* ¶¶ 8–10. This decision was dispositive. If the SBA had not included this invalid loan in its calculation, CHH would have been eligible for forgiveness: Setting aside H.J. Russell's loan, the cumulative amount of the Russell Group's second-draw PPP loans was $3,409,573.82, nearly $600,000 below the Corporate Group Maximum Rule's $4 million cap. *Id.* ¶ 15.

Nothing in the terse text of the Corporate Group Maximum Rule required the SBA to include H.J. Russell's invalid loan in its calculation. The entirety of the Rule, as applied to second-draw PPP loans, states simply that "[b]usinesses that are part of a single corporate group shall in no event receive more than $4,000,000 of Second Draw PPP Loans in the aggregate." 86 Fed. Reg. at 3720. Neither SBA regulations nor SBA guidance provides any additional detail explaining how the Rule will be implemented.

Accordingly, there was no reason of law or policy for the SBA to count H.J. Russell's invalid loan when applying the Corporate Group Maximum Rule to CHH. After all, the purpose of the Rule is to "preserve the limited resources available to the PPP program." 86 Fed. Reg. at 3702. Counting H.J. Russell's loan does not further that purpose, since the SBA will not expend any funds forgiving that loan. At bottom, the objective of the Rule is to ensure that the SBA does not spend more than $4 million on second-draw loans for entities

within a single corporate group; because the SBA is not going to spend any money forgiving H.J. Russell's loan, that objective is satisfied here even if the SBA forgives CHH's second-draw loan. There was thus no reason to apply the Rule to deny forgiveness of CHH's loan.

Notwithstanding all this, the SBA offered no explanation or justification for including H.J. Russell's invalid $2 million loan in its analysis. This failure to offer "a satisfactory explanation for its action" renders the SBA's decision arbitrary and capricious. *Ohio v. EPA*, 144 S. Ct. at 2053 (quotation marks and citation omitted). At the very least, the invalidity of the H.J. Russell loan was a "relevant factor" to the SBA's decision, and "it was arbitrary and capricious for the [SBA] not to consider" it. *Bidi Vapor*, 47 F.4th at 1203. The Court should therefore "hold unlawful and set aside" the SBA's decision. 5 U.S.C. § 706(2)(A).

### B. The SBA, arbitrarily and without explanation, denied forgiveness of all of CHH's second-draw loan, even the portion that fell under the Rule's $4 million cap

Finally, even if the Court were to conclude that the SBA properly considered H.J. Russell's loan within the cumulative amount subject to the Corporate Group Maximum Rule, the SBA still arbitrarily applied the Rule to deny the portion of CHH's loan that was **under** the Rule's $4 million cap.

In creating the PPP, Congress made loan forgiveness mandatory to the extent borrowers used PPP funds for the statutorily enumerated purposes. *See*

15 U.S.C. § 636(a)(37)(J)(ii) (providing that an "eligible entity **shall** be eligible for forgiveness of indebtedness … as described in section 636m" (emphasis added)); 15 U.S.C. § 636m(b) ("An eligible recipient **shall** be eligible for forgiveness of indebtedness on a covered loan in an amount equal to the sum of the . . . costs incurred and payments made during the covered period" for expenses and payments including such things as payroll costs and rent. (emphasis added)). The SBA regulations also specifically contemplate partial forgiveness of loans, and the agency routinely grants partial forgiveness. *See* 86 Fed. Reg. at 3706 ("For example, if a borrower uses 59 percent of its PPP loan for payroll costs, it will not receive the full amount of loan forgiveness it might otherwise be eligible to receive. **Instead, the borrower will receive partial loan forgiveness** …." (emphasis added)).

Here, there is no dispute that CHH used its loan for proper purposes, including to keep employees on its payroll. SMF ¶¶ 13, 24. Nevertheless, the SBA denied CHH's **entire** $2 million loan even though $590,426.18 of the loan was **under** the Corporate Group Maximum Rule's $4 million cap. *Id.* ¶ 9, 25. At the very least, this portion was eligible for forgiveness. 15 U.S.C. § 636m(b).

Rather than grant partial forgiveness, the SBA's decision takes the apparent position that the Corporate Group Maximum Rule requires denying forgiveness of a loan *in toto* if that loan puts the business's "corporate group"

one cent over the Rule's $4 million cap. Yet again, however, nothing in the text of the Corporate Group Maximum Rule or any SBA guidance requires or even suggests any such position. Indeed, the purpose of the PPP suggests the exact opposite position. The PPP induced employers to keep employees on payrolls even though doing so may have been economically unwarranted (because, due to the pandemic, the employees themselves could not work or had no customers to serve). The PPP induced employers to act in this otherwise-unjustified manner through the provision of forgivable loans. 15 U.S.C. § 636(a)(37)(J)(ii). The SBA's application of the Corporate Group Maximum Rule, a rule nowhere suggested by the statutory text, thus contravenes and frustrates the PPP's purpose—providing forgivable loans to encourage businesses to use PPP funds to retain employees they would have otherwise laid off.

In short, the arbitrarily applied the Corporate Group Maximum Rule in a manner that punished CHH for doing exactly what Congress wanted it to do. Given the purpose of the PPP, there is no plausible justification for **completely** denying forgiveness of CHH's loan simply because that loan, aggregated with loans received by related businesses, exceeds $4 million.

Further, even if there were a plausible justification for the SBA's hyper-strict approach, the APA required the SBA to at least provide that justification. Below, however, the SBA completely failed to address this critical point. The

SBA therefore violated its obligation to provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 144 S. Ct. at 2053 (quotation marks and citation omitted). For this additional, independently sufficient reason, the SBA's decision here should be vacated as arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should reverse and set aside set aside the decisions below, direct the SBA to issue a new decision forgiving CHH's second-draw PPP Loan, and vacate the Corporate Group Maximum Rule and declare that it is contrary to the CARES Act.

Respectfully submitted, this 12th day of November, 2024.

*/s/ Kian J. Hudson*
Kian J. Hudson
(*pro hac vice* application forthcoming)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN  46204
Tel. (317) 229-3111
Kian.Hudson@btlaw.com

Eric S. Fisher
Georgia Bar No. 250428
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326-1092
Tel. (404) 264-4045
EFisher@btlaw.com

*Counsel for Petitioner Concessions HH, JV*

## CERTIFICATE OF COMPLIANCE

In accordance with Northern District of Georgia Local Rules 5.1(C) and 7.1(D), I hereby certify that this brief complies with the Local Rules' type limitation because it has been set in a 13-point, proportionately spaced typeface (Century Schoolbook).


Dated: November 12, 2024                    /s/ *Kian J. Hudson*

                                            *Counsel for Petitioner*
                                            *Concessions HH, JV*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the within and foregoing *PETITIONER CONCESSIONS HH, JV'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT* with the Clerk of Court by using the CM/ECF System which will automatically send email notification of filing to all counsel of record.

Dated: November 12, 2024                    /s/ *Kian J. Hudson*

                                                            *Counsel for Petitioner*
                                                            *Concessions HH, JV*

27

ADDENDUM

Code of Federal Regulations
   Title 13. Business Credit and Assistance
      Chapter I. Small Business Administration
         Part 121. Small Business Size Regulations (Refs & Annos)
            Subpart A. Size Eligibility Provisions and Standards
               Provisions of General Applicability

This section has been updated. Click here for the updated version.

13 C.F.R. § 121.103

§ 121.103 How does SBA determine affiliation?

Effective: December 30, 2019 to April 14, 2020

(a) General Principles of Affiliation.

(1) Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists.

(2) SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships, in determining whether affiliation exists.

(3) Control may be affirmative or negative. Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.

(4) Affiliation may be found where an individual, concern, or entity exercises control indirectly through a third party.

(5) In determining whether affiliation exists, SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation.

(6) In determining the concern's size, SBA counts the receipts, employees, or other measure of size of the concern whose size is at issue and all of its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit.

(7) For SBA's Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) programs, the bases for affiliation are set forth in § 121.702.

(8) For applicants in SBA's Business Loan, Disaster Loan, and Surety Bond Guarantee Programs, the size standards and bases for affiliation are set forth in § 121.301.

(b) Exceptions to affiliation coverage.

(1) Business concerns owned in whole or substantial part by investment companies licensed, or development companies qualifying, under the Small Business Investment Act of 1958, as amended, are not considered affiliates of such investment companies or development companies.

(2)(i) Business concerns owned and controlled by Indian Tribes, Alaska Native Corporations (ANCs) organized pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), Native Hawaiian Organizations (NHOs), Community Development Corporations (CDCs) authorized by 42 U.S.C. 9805, or wholly-owned entities of Indian Tribes, ANCs, NHOs, or CDCs are not considered affiliates of such entities.

(ii) Business concerns owned and controlled by Indian Tribes, ANCs, NHOs, CDCs, or wholly-owned entities of Indian Tribes, ANCs, NHOs, or CDCs, are not considered to be affiliated with other concerns owned by these entities because of their common ownership or common management. In addition, affiliation will not be found based upon the performance of common administrative services so long as adequate payment is provided for those services. Affiliation may be found for other reasons.

(A) Common administrative services which are subject to the exception to affiliation include, bookkeeping, payroll, recruiting, other human resource support, cleaning services, and other duties which are otherwise unrelated to contract performance or management and can be reasonably pooled or otherwise performed by a holding company, parent entity, or sister business concern without interfering with the control of the subject firm.

(B) Contract administration services include both services that could be considered "common administrative services" under the exception to affiliation and those that could not.

(1) Contract administration services that encompass actual and direct day-to-day oversight and control of the performance of a contract/project are not shared common administrative services, and would include tasks or functions such as negotiating directly with the government agency regarding proposal terms, contract terms, scope and modifications, project scheduling, hiring and firing of employees, and overall responsibility for the day-to-day and overall project and contract completion.

(2) Contract administration services that are administrative in nature may constitute administrative services that can be shared, and would fall within the exception to affiliation. These administrative services include tasks such as record retention not related to a specific contract (e.g., employee time and attendance records), maintenance of databases for awarded contracts, monitoring for regulatory compliance, template development, and assisting accounting with invoice preparation as needed.

(C) Business development may include both services that could be considered "common administrative services" under the exception to affiliation and those that could not. Efforts at the holding company or parent level to identify possible procurement opportunities for specific subsidiary companies may properly be considered "common administrative services" under the exception to affiliation. However, at some point the opportunity identified by the holding company's or parent entity's business development efforts becomes concrete enough to assign to a subsidiary and at that point the subsidiary must be involved in the business development efforts for such opportunity. At the

proposal or bid preparation stage of business development, the appropriate subsidiary company for the opportunity has been identified and a representative of that company must be involved in preparing an appropriate offer. This does not mean to imply that one or more representatives of a holding company or parent entity cannot also be involved in preparing an offer. They may be involved in assisting with preparing the generic part of an offer, but the specific subsidiary that intends to ultimately perform the contract must control the technical and contract specific portions of preparing an offer. In addition, once award is made, employee assignments and the logistics for contract performance must be controlled by the specific subsidiary company and should not be performed at a holding company or parent entity level.

(3) Business concerns which are part of an SBA approved pool of concerns for a joint program of research and development or for defense production as authorized by the Small Business Act are not affiliates of one another because of the pool.

(4) Business concerns which lease employees from concerns primarily engaged in leasing employees to other businesses or which enter into a co-employer arrangement with a Professional Employer Organization (PEO) are not affiliated with the leasing company or PEO solely on the basis of a leasing agreement.

(5) For financial, management or technical assistance under the Small Business Investment Act of 1958, as amended, an applicant is not affiliated with the investors listed in paragraphs (b)(5)(i) through (vi) of this section.

(i) Venture capital operating companies, as defined in the U.S. Department of Labor regulations found at 29 CFR 2510.3–101(d);

(ii) Employee benefit or pension plans established and maintained by the Federal government or any state, or their political subdivisions, or any agency or instrumentality thereof, for the benefit of employees;

(iii) Employee benefit or pension plans within the meaning of the Employee Retirement Income Security Act of 1974, as amended (29 U.S.C. 1001, et seq.);

(iv) Charitable trusts, foundations, endowments, or similar organizations exempt from Federal income taxation under section 501(c) of the Internal Revenue Code of 1986, as amended (26 U.S.C. 501(c));

(v) Investment companies registered under the Investment Company Act of 1940, as amended (1940 Act) (15 U.S.C. 80a–1, et seq.); and

(vi) Investment companies, as defined under the 1940 Act, which are not registered under the 1940 Act because they are beneficially owned by less than 100 persons, if the company's sales literature or organizational documents indicate that its principal purpose is investment in securities rather than the operation of commercial enterprises.

(6) A firm that has an SBA–approved mentor-protégé agreement authorized under § 124.520 or § 125.9 of this chapter is not affiliated with its mentor firm solely because the protégé firm receives assistance from the mentor under the agreement. Similarly, a protégé firm is not affiliated with its mentor solely because the protégé firm receives assistance from the mentor under a federal mentor-protégé program where an exception to affiliation is specifically authorized by statute or

by SBA under the procedures set forth in § 121.903. Affiliation may be found in either case for other reasons as set forth in this section.

(7) The member shareholders of a small agricultural cooperative, as defined in the Agricultural Marketing Act (12 U.S.C. 1141j), are not considered affiliated with the cooperative by virtue of their membership in the cooperative.

(8) These exceptions to affiliation and any others set forth in § 121.702 apply for purposes of SBA's SBIR and STTR programs.

(9) In the case of a solicitation for a bundled contract, a small business contractor may enter into a Small Business Teaming Arrangement with one or more small business subcontractors and submit an offer as a small business without regard to affiliation, so long as each team member is small for the size standard assigned to the contract or subcontract. The agency shall evaluate the offer in the same manner as other offers with due consideration of the capabilities of the subcontractors.

(c) Affiliation based on stock ownership.

(1) A person (including any individual, concern or other entity) that owns, or has the power to control, 50 percent or more of a concern's voting stock, or a block of voting stock which is large compared to other outstanding blocks of voting stock, controls or has the power to control the concern.

(2) If two or more persons (including any individual, concern or other entity) each owns, controls, or has the power to control less than 50 percent of a concern's voting stock, and such minority holdings are equal or approximately equal in size, and the aggregate of these minority holdings is large as compared with any other stock holding, SBA presumes that each such person controls or has the power to control the concern whose size is at issue. This presumption may be rebutted by a showing that such control or power to control does not in fact exist.

(3) If a concern's voting stock is widely held and no single block of stock is large as compared with all other stock holdings, the concern's Board of Directors and CEO or President will be deemed to have the power to control the concern in the absence of evidence to the contrary.

(d) Affiliation arising under stock options, convertible securities, and agreements to merge.

(1) In determining size, SBA considers stock options, convertible securities, and agreements to merge (including agreements in principle) to have a present effect on the power to control a concern. SBA treats such options, convertible securities, and agreements as though the rights granted have been exercised.

(2) Agreements to open or continue negotiations towards the possibility of a merger or a sale of stock at some later date are not considered "agreements in principle" and are thus not given present effect.

(3) Options, convertible securities, and agreements that are subject to conditions precedent which are incapable of fulfillment, speculative, conjectural, or unenforceable under state or Federal law, or where the probability of the transaction (or exercise of the rights) occurring is shown to be extremely remote, are not given present effect.

(4) An individual, concern or other entity that controls one or more other concerns cannot use options, convertible securities, or agreements to appear to terminate such control before actually doing so. SBA will not give present effect to individuals', concerns' or other entities' ability to divest all or part of their ownership interest in order to avoid a finding of affiliation.

(e) Affiliation based on common management. Affiliation arises where one or more officers, directors, managing members, or partners who control the board of directors and/or management of one concern also control the board of directors or management of one or more other concerns.

(f) Affiliation based on identity of interest. Affiliation may arise among two or more persons with an identity of interest. Individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships) may be treated as one party with such interests aggregated. Where SBA determines that such interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate.

(1) Firms owned or controlled by married couples, parties to a civil union, parents, children, and siblings are presumed to be affiliated with each other if they conduct business with each other, such as subcontracts or joint ventures or share or provide loans, resources, equipment, locations or employees with one another. This presumption may be overcome by showing a clear line of fracture between the concerns. Other types of familial relationships are not grounds for affiliation on family relationships.

(2) SBA may presume an identity of interest based upon economic dependence if the concern in question derived 70% or more of its receipts from another concern over the previous three fiscal years.

(i) This presumption may be rebutted by a showing that despite the contractual relations with another concern, the concern at issue is not solely dependent on that other concern, such as where the concern has been in business for a short amount of time and has only been able to secure a limited number of contracts.

(ii) A business concern owned and controlled by an Indian Tribe, ANC, NHO, CDC, or by a wholly-owned entity of an Indian Tribe, ANC, NHO, or CDC, is not considered to be affiliated with another concern owned by that entity based solely on the contractual relations between the two concerns.

Example 1 to paragraph (f): Firm A has been in business for 9 months and has two contracts. Contract 1 is with Firm B and is valued at $900,000 and Contract 2 is with Firm C and is valued at $200,000. Thus, Firm B accounts for over 70% of Firm A's receipts. Absent other connections between A and B, the presumption of affiliation between A and B is rebutted because A is a new firm.

Example 2 to paragraph (f): Firm A has been in business for five years. It has over 200 contracts. Of that 200, 195 are with Firm B, and the value of those contracts is greater than 70% of the revenue over the previous three years. In this case, SBA

would most likely find the two firms affiliated unless the firm could provide some other compelling rebuttal to the very strong presumption that it should be considered affiliated with Firm B

(g) Affiliation based on the newly organized concern rule. Affiliation may arise where former officers, directors, principal stockholders, managing members, or key employees of one concern organize a new concern in the same or related industry or field of operation, and serve as the new concern's officers, directors, principal stockholders, managing members, or key employees, and the one concern is furnishing or will furnish the new concern with contracts, financial or technical assistance, indemnification on bid or performance bonds, and/or other facilities, whether for a fee or otherwise. A concern may rebut such an affiliation determination by demonstrating a clear line of fracture between the two concerns. A "key employee" is an employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern.

(h) Affiliation based on joint ventures. A joint venture is an association of individuals and/or concerns with interests in any degree or proportion consorting to engage in and carry out no more than three specific or limited-purpose business ventures for joint profit over a two year period, for which purpose they combine their efforts, property, money, skill, or knowledge, but not on a continuing or permanent basis for conducting business generally. This means that a specific joint venture entity generally may not be awarded more than three contracts over a two year period, starting from the date of the award of the first contract, without the partners to the joint venture being deemed affiliated for all purposes. Once a joint venture receives one contract, SBA will determine compliance with the three awards in two years rule for future awards as of the date of initial offer including price. As such, an individual joint venture may be awarded more than three contracts without SBA finding general affiliation between the joint venture partners where the joint venture had received two or fewer contracts as of the date it submitted one or more additional offers which thereafter result in one or more additional contract awards. The same two (or more) entities may create additional joint ventures, and each new joint venture entity may be awarded up to three contracts in accordance with this section. At some point, however, such a longstanding inter-relationship or contractual dependence between the same joint venture partners will lead to a finding of general affiliation between and among them. For purposes of this provision and in order to facilitate tracking of the number of contract awards made to a joint venture, a joint venture: Must be in writing and must do business under its own name; must be identified as a joint venture in the System for Award Management (SAM); may be in the form of a formal or informal partnership or exist as a separate limited liability company or other separate legal entity; and, if it exists as a formal separate legal entity, may not be populated with individuals intended to perform contracts awarded to the joint venture (i.e., the joint venture may have its own separate employees to perform administrative functions, but may not have its own separate employees to perform contracts awarded to the joint venture). SBA may also determine that the relationship between a prime contractor and its subcontractor is a joint venture, and that affiliation between the two exists, pursuant to paragraph (h)(5) of this section. For purposes of this paragraph (h), contract refers to prime contracts, and any subcontract in which the joint venture is treated as a similarly situated entity as the term is defined in part 125 of this chapter.

Example 1 to paragraph (h) introductory text. Joint Venture AB has received two contracts. On April 2, Joint Venture AB submits an offer for Solicitation 1. On June 6, Joint Venture AB submits an offer for Solicitation 2. On July 13, Joint Venture AB submits an offer for Solicitation 3. In September, Joint Venture AB is found to be the apparent successful offeror for all three solicitations. Even though the award of the three contracts would give Joint Venture AB a total of five contract awards, it could receive those awards without causing general affiliation between its joint venture partners because Joint Venture AB had not yet received three contract awards as of the dates of the offers for each of three solicitations at issue.

Example 2 to paragraph (h) introductory text. Joint Venture XY receives a contract on December 19, year 1. It may receive two additional contracts through December 19, year 3. On August 6, year 2, XY receives a second contract. It receives no other contract awards through December 19, year 3 and has submitted no additional offers prior to December 19, year 3. Because two years have passed since the date of the first contract award, after December 19, year 3, XY cannot receive an additional contract award. The individual parties to XY must form a new joint venture if they want to seek and be awarded additional contracts as a joint venture.

Example 3 to paragraph (h) introductory text. Joint Venture XY receives a contract on December 19, year 1. On May 22, year 2, XY submits an offer for Solicitation 1. On June 10, year 2, XY submits an offer for Solicitation 2. On June 19, year 2, XY receives a second contract responding to Solicitation 1. XY is not awarded a contract responding to Solicitation 2. On December 15, year 3, XY submits an offer for Solicitation 3. In January, XY is found to be the apparent successful offeror for Solicitation 3. XY is eligible for the contract award because compliance with the three awards in two years rule is determined as of the date of the initial offer including price, XY submitted its offer prior to December 19, year 3, and XY had not received three contract awards prior to its offer on December 15.

(1) Parties to a joint venture are affiliates if any one of them seeks SBA financial assistance for use in connection with the joint venture.

(2) Except as provided in paragraph (h)(3) of this section, concerns submitting offers on a particular procurement or property sale as joint venturers are affiliated with each other with regard to the performance of that contract.

(3) Exception to affiliation for certain joint ventures.

(i) A joint venture of two or more business concerns may submit an offer as a small business for a Federal procurement, subcontract or sale so long as each concern is small under the size standard corresponding to the NAICS code assigned to the contract.

(ii) Two firms approved by SBA to be a mentor and protégé under § 125.9 of this chapter may joint venture as a small business for any Federal government prime contract or subcontract, provided the protégé qualifies as small for the size standard corresponding to the NAICS code assigned to the procurement, and the joint venture meets the requirements of §§ 124.513 (c) and (d), §§ 125.8(b) and (c), §§ 125.18(b)(2) and (3), §§ 126.616(c) and (d), or §§ 127.506(c) and (d) of this chapter, as appropriate.

(iii) Two firms approved by SBA to be a mentor and protégé under § 124.520 of these regulations may joint venture as a small business for any Federal government prime contract or subcontract, provided the protégé qualifies as small for the size standard corresponding to the NAICS code assigned to the procurement and, for purposes of 8(a) sole source requirements, has not reached the dollar limit set forth in § 124.519 of these regulations. If the procurement is to be awarded through the 8(a) BD program, SBA must approve the joint venture pursuant to § 124.513. If the procurement is to be awarded other than through the 8(a) BD program (e.g., small business set aside, HUBZone set aside), SBA need not approve the joint venture prior to award, but if the size status of the joint venture is protested, the provisions of §§ 124.513(c) and (d) will apply. This means that the joint venture must meet the requirements of §§ 124.513(c) and (d) in order to receive the exception to affiliation authorized by this paragraph. In either case, after contract performance is complete, the 8(a) partner to the joint venture must submit a report to its servicing SBA district office explaining how the applicable performance of work requirements were met for the contract.

(4) A contractor and its ostensible subcontractor are treated as joint venturers for size determination purposes. An ostensible subcontractor is a subcontractor that is not a similarly situated entity, as that term is defined in § 125.1 of this chapter, and performs primary and vital requirements of a contract, or of an order, or is a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage

of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

(5) For size purposes, a concern must include in its receipts its proportionate share of joint venture receipts, and in its total number of employees its proportionate share of joint venture employees.

(i) Affiliation based on franchise and license agreements. The restraints imposed on a franchisee or licensee by its franchise or license agreement relating to standardized quality, advertising, accounting format and other similar provisions, generally will not be considered in determining whether the franchisor or licensor is affiliated with the franchisee or licensee provided the franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. Affiliation may arise, however, through other means, such as common ownership, common management or excessive restrictions upon the sale of the franchise interest.

**Credits**

[62 FR 11318, March 12, 1997; 62 FR 26381, May 14, 1997; 63 FR 35738, June 30, 1998; 64 FR 57370, Oct. 25, 1999; 65 FR 30840, May 15, 2000; 65 FR 35812, June 6, 2000; 65 FR 45832, 45833, July 26, 2000; 69 FR 29201, May 21, 2004; 70 FR 51248, Aug. 30, 2005; 76 FR 8251, Feb. 11, 2011; 77 FR 76224, Dec. 27, 2012; 78 FR 61130, Oct. 2, 2013; 81 FR 34258, May 31, 2016; 81 FR 41428, June 27, 2016; 81 FR 48578, July 25, 2016; 81 FR 71982, Oct. 19, 2016; 83 FR 12851, March 26, 2018; 84 FR 65661, Nov. 29, 2019]

SOURCE: 61 FR 3286, Jan. 31, 1996; 62 FR 11318, March 12, 1997; 63 FR 31907, June 11, 1998; 63 FR 46642, Sept. 2, 1998; 64 FR 26280, May 14, 1999; 64 FR 57370, Oct. 25, 1999; 67 FR 62337, Oct. 7, 2002; 69 FR 25266, May 5, 2004; 69 FR 29420, May 24, 2004; 70 FR 51248, Aug. 30, 2005; 70 FR 56814, Sept. 29, 2005; 70 FR 69047, 69052, Nov. 14, 2005; 73 FR 56947, Oct. 1, 2008; 74 FR 36110, July 22, 2009; 75 FR 48550, Aug. 11, 2010; 77 FR 7513, Feb. 10, 2012; 77 FR 76224, Dec. 27, 2012; 78 FR 37403, June 20, 2013; 85 FR 20821, April 15, 2020; 87 FR 35882, June 14, 2022; 87 FR 59285, Sept. 29, 2022; 87 FR 73412, Nov. 29, 2022; 88 FR 21086, April 10, 2023; 88 FR 26199, April 27, 2023; 88 FR 46014, July 18, 2023, unless otherwise noted.

AUTHORITY: 15 U.S.C. 632, 634(b)(6), 636(a)(36), 662, and 694a(9).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    8